UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RICO SIMMONS,                          §
                                       §
   Plaintiff,                          §
                                       §
v.                                     §     CIVIL ACTION NO. 3:19-CV-1206-B
                                       §
TRITON ELEVATOR, LLC, and              §
DERALD ARMSTRONG,                      §
                                       §
   Defendants.                         §

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendants Triton Elevator, LLC ("Triton") and Derald Armstrong

("Armstrong")'s Motion for Summary Judgment (Doc. 56). For the reasons explained below, the

Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

## I.

## BACKGROUND[1]

A.   *Factual Background*[2]

This is an employment discrimination action by Plaintiff Rico Simmons, a Black man who

formerly worked for Triton. Doc. 57, Defs.' Br., 1; Doc. 59, Pl.'s Resp., 5. Triton is an elevator

manufacturer service and repair company where Armstrong serves as Chief Operating Officer. Doc.

---

[1] The Court draws its factual account from the summary-judgment record. For the sake of brevity, the Court summarizes only those factual allegations raised by the parties' briefing and pertinent to the Court's analysis.

[2] Throughout this Order, the Court uses the ECF-generated page numbers—rather than any page numbering provided by the parties—to refer to specific pages in Defendants' appendix (Doc. 58) and Plaintiff's appendix (Doc. 60).

60, Pl.'s App., 8. In August 2018, Triton hired Plaintiff as an engineer. *Id.* at 11, 118. Plaintiff's direct supervisor was Rick David. *Id.* at 142. According to David, Plaintiff performed satisfactory work at Triton, was amenable to learning new techniques, and received a promised raise three months into his employment due to his satisfactory performance. *Id.* Further, Plaintiff never received any formal discipline or warning while employed with Triton.  *Id.* at 142–43.

Despite his satisfactory work performance, Plaintiff's employment with Triton was far from smooth sailing. Plaintiff claims that while employed at Triton, he was subjected to several "racist and offensive" comments. Doc. 59, Pl.'s Resp., 5. Further, he claims he was fired by Armstrong due to his complaints about these comments. Doc. 39, Second Am. Compl., ¶ 30. The Court details Plaintiff's allegations of racially offensive comments at Triton, followed by the circumstances surrounding Plaintiff's termination, below.

### 1.    Racially Offensive Comments

To start, Plaintiff explains that while in his own office, he overheard Danny Duncan—Armstrong's former brother-in-law and a Director at Triton—using the terms "n*****" and "boy" in a conversation with David. Doc. 58, Defs.' App., 140, 144; Doc. 60, Pl.'s App., 11 , 117. Then, Duncan and David began talking about Plaintiff without "using these terms out loud anymore[.]" Doc. 58, Defs.' App., 140. Duncan denies using the terms. *Id.* at 208–09.[3]

Additionally, Plaintiff alleges that prior to that conversation between Duncan and David, David once used the term "monkey" to refer to a Black employee. Doc. 59, Pl.'s Resp., 12. David acknowledges that he did refer to an individual as a "monkey" but denies that he was referring to a

---

[3] This is the incident leading to Plaintiff's termination and is further detailed in Section I.A.2.

person of color. Doc. 60, Pl.'s App., 143. Plaintiff explains that until this "monkey" comment, Plaintiff never had an issue with David—David was "very respectful," so the "monkey" comment "surprised" Plaintiff. Doc. 58, Defs.' App., 130. Plaintiff surreptitiously recorded a conversation between he and David in which they discuss this use of the term "monkey." *See* Doc. 60, Pl.'s App., 52. In the conversation, Plaintiff confronted David on calling a "Black man . . . a monkey[.]" *Id.* at 56. David responded that he "wasn't referring to anybody in particular" and that he meant a "grease monkey." *Id.* Plaintiff then explained how use of terms like "monkey" and "brother" offend him. *Id.* As the conversation progressed, David apologized to Plaintiff, stated that he respects Plaintiff, and indicated that he did not want Plaintiff to feel uncomfortable. *See id.* at 69, 76. As Plaintiff acknowledges, David also asked Plaintiff to "help [him] to learn how not to be a racist person." Doc. 58, Defs.' App., 110.

Further, Plaintiff claims that David once referred to David's own son as a "wigger" and "ghetto" in a conversation with Plaintiff. *Id.* at 105; Doc. 60, Pl.'s App., 58. The latter reference occurred during the recorded conversation mentioned above. David was explaining how his son speaks differently than David or Plaintiff—"it's almost ghetto the way he speaks." Doc. 60, Pl.'s App., 58. When Plaintiff stated that the term "ghetto" was "racist in itself," David acknowledged that "it is a very stereotypical thing to say, but it defines how he is." *Id.* at 58–59. David and Plaintiff then proceeded to discuss their differing viewpoints on the connotation of the term "ghetto." *See id.* at 59–63. However, David does not recall calling his son a "wigger." *Id.* at 144.

Next, Plaintiff alleges that after initially confronting David on use of the term "monkey," employees began to refer to the "Brother printer" in the office—a printer manufactured by a company called "Brother"—"with an inflection or emphasis on the word 'Brother' that led [Plaintiff]

to conclude they were mocking him." Doc. 59, Pl.'s Resp., 6 (citation omitted); *see* Doc. 60, Pl.'s App., 144.  Plaintiff mentioned this issue in his recorded conversation with David, and David apologized and stated he did not mean to offend Plaintiff. Doc. 60, Pl.'s App., 56.

Plaintiff also alleges that various Triton employees, including Duncan and Kris Hunt (VP of Operations and "informally in charge of human resources"), referred to him as "boy" or "homeboy[.]" Doc. 59, Pl.'s Resp., 5, 12; *see, e.g.*, Doc. 58, Defs.' App., 97, 115; Doc. 60, Pl.'s App., 48. For instance, Plaintiff claims Duncan once stated to Plaintiff: "Hey homeboy, you can't be chilling in the hallway. You scared me boy." Doc. 60, Pl.'s App., 48. In his deposition, David also testified that Plaintiff was offended when a supervisor stated, "I'll get this to my boy Jake to get it installed." *Id.* at 145. According to David, Plaintiff then told those present, "That's a racial term and you shouldn't be saying that," despite that both Jake and the man to whom the supervisor was speaking were White. *Id.*

Further, Plaintiff states that Don Criswell (President and CEO of Triton), Duncan, and Hunt passed by Plaintiff's office when the office lacked a working light. *Id.* at 9, 48. According to Plaintiff, the men stated the office was "really black," and Hunt stated he could only see Plaintiff's teeth. *Id.* at 48. Plaintiff also recounts that Hunt "made it a point to discuss skits from the Dave Chapelle show, in particular the skits in which the actors frequently used the word 'n*****.'" *Id.*

Finally, Plaintiff recalls two incidents with a secretary: once, she stated Plaintiff's hair made him look as if he was "from the hood" and "[s]cary"; another time, she "confided to [Plaintiff] in a shameful tone that her grandmother had been African American." *Id.* at 48–49. With respect to the second encounter, Plaintiff "understood that the secretary was trying to soften her statements about [Plaintiff's] hair." *Id.* at 49.

Plaintiff claims that his complaints to leadership at Triton about the various remarks "fell on deaf ears." Doc. 59, Pl.'s Resp., 7.

First, Plaintiff states he complained to Armstrong on multiple occasions. Doc. 60, Pl.'s App., 49. He explains that when he complained about racist comments to Armstrong in January 2019, Armstrong brushed off his complaints and, at some point, responded that he "had previously dated a black woman but had never told anyone about it," thereby suggesting this was a secret. *Id.*; *see* Doc. 58, Defs.' App., 98–99 (describing Plaintiff's complaint to Armstrong); *id.* at 138–39 (explaining he talked to Armstrong in January 2019). Armstrong claims Plaintiff misconstrued this statement: Armstrong was actually informing Plaintiff he had provided money to an "African-American woman girlfriend" and did not want others to know because this was "company money." Doc. 60, Pl.'s App., 15. Second, Plaintiff expressed his frustration to David in the recorded conversation summarized above. Third, Plaintiff claims he "complained to Mr. Hunt" about the "monkey" comment and the "Brother" printer terminology. *Id.* at 49.

Based on Plaintiff's complaints, Criswell discussed the use of the term "the 'brother' printer" and David's "monkey" comment with David. *Id.* at 87. Criswell and David determined that David would apologize for using both terms, and Criswell "took no further action[.]" *Id.*

On his own accord, Plaintiff attempted to educate the office by distributing "Jim Crow Etiquette" flyers. *Id.* at 39; Doc. 58, Defs.' App., 102. Further, in light of the "racial comments" by David and "multiple stereotypical comments and questions," Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) on February 7, 2019. Doc. 58, Defs.' App., 228.

2.     Plaintiff's Termination

About three weeks after Plaintiff filed his EEOC charge, Armstrong fired Plaintiff. *See id.* at

142, 232. The parties' accounts of Plaintiff's termination vary. The Court begins with Plaintiff's

versions and then summarizes the recollections of Armstrong, David, and Duncan.

       *a.*     *Plaintiff's Accounts*

In his deposition, Plaintiff claims that he overheard a conversation between David and

Duncan. *Id.* at 140. According to Plaintiff, David and Duncan were using "racial terms" including

"n\*\*\*\*\*" and "boy[.]" *Id.* Upon overhearing them, Plaintiff entered the doorway, and Duncan and

David were "referring to [Plaintiff] now, not using [the] terms out loud anymore[.]" *Id.* Plaintiff then

told Duncan that he can talk to Plaintiff directly. *Id.* at 140–41. Plaintiff then "asked him again" and

Duncan became "loud" and said, "f\*\*\* you, I don't have to tell you anything[.]" *Id.* at 141. Plaintiff

and Duncan continued to argue, and Armstrong walked in the room. *Id.* Armstrong asked what was

happening, and Plaintiff explained that he wanted Duncan to "treat [him] like a man and not be

disrespectful[.]" *Id.* at 142. Armstrong then fired Plaintiff, told him to leave, and commented, "[Y]ou

filed on people[.]" *Id.* Plaintiff replied, "[Y]eah, I filed on people who do things to me. . . . I'm not

going to just file on somebody for no f\*\*\*\*\*\* reason." *Id.* Then, according to Plaintiff, Armstrong

"turn[ed] around to [him] and charg[ed]." *Id.* Duncan stood between Armstrong and Plaintiff, and

Armstrong then began saying "f\*\*\* it, just do something," "[f]\*\*\* off," and "I'll f\*\*\*\*\*\* kill you,"

and "just call the police[.]" *Id.*

Plaintiff's declaration differs in the details. In his declaration, Plaintiff claims that after he

"informed [Armstrong] that [Duncan] was using offensive language again," Armstrong stated that

he was "sick of [Plaintiff's sh\*\*]" and "approached [Plaintiff] in a physically menacing manner." Doc.

60, Pl.'s App., 50. Armstrong then began to walk away, turned, "and charged toward [Plaintiff]

stating[,] 'I will hurt you. I will kill you. You're going to file on people?'" *Id.* Then, Armstrong

"informed [Plaintiff] that [he] was fired." *Id.*

          *b.*    *Armstrong's Account*

      Armstrong states that when he entered the office, he "heard [Duncan and Simmons] arguing down the hallway[.]" Doc. 58, Def.'s App., 218. He walked over and asked, "What in the hell is going on?" *Id.* Because Armstrong was angry in the moment, he doesn't remember if he said he was "sick of" Plaintiff's "s***[.]" *Id.* at 218–19. He admits that he mentioned Plaintiff "filed on people," but says he says he did so only after Plaintiff brought up talking to an attorney. *Id.* at 219. Armstrong explains that when Plaintiff told Armstrong he was going to go to his attorney, Armstrong then said, "It doesn't surprise me. You filed on people already." *Id.* Armstrong states he did not mean that Plaintiff "filed on" Armstrong or Triton—instead, Armstrong was referring to the "common knowledge" among "everybody" at Triton that Plaintiff had filed on other companies. *See id.* Additionally, Armstrong claims that Plaintiff called him "a goddamned punk ass honkey" as Armstrong began to walk away from the encounter. *Id.* at 221.

          *c.*    *David's Account*

      David explains that he and Duncan were in Duncan's office discussing a job. Doc. 60, Pl.'s App., 145. Plaintiff then came to the doorway and, because Plaintiff had previously had conversations about this job, stated, "I'm standing right here, you can address me." *Id.* Plaintiff began "to get agitated and it felt [to David] as though [Plaintiff] was trying to instigate anger with" Duncan. *Id.* at 146. David attempted "to diffuse the situation," but "[i]t got loud." *Id.* Hunt, who handles human resources at Triton, then entered and asked what was happening, and Plaintiff "continued to get loud"; at some point, Hunt called 911. *Id.* at 87, 146; Doc. 58, Defs.' App., 203. Armstrong entered, "heard what was going on and walked toward" them. Doc. 60, Pl.'s App., 146.

Plaintiff was becoming louder—at some point "yelling"—and Armstrong "said he finally had had enough of this" and that Plaintiff "didn't have a job here anymore." *Id.* David explains that "[v]erbiage was going back and forth," and Plaintiff "got mad at [Armstrong] and called him a punk-ass." *Id.* Armstrong then stepped forward toward Plaintiff; Duncan and David stepped between Armstrong and Plaintiff; and Armstrong "calmed down and told [Plaintiff] he was fired." *Id.*

> d.   *Duncan's Account*

Finally, Duncan explains that he and David were discussing a job, at which point Plaintiff entered the office where they were and told Duncan something along the lines of, "You need to be talking to me about that job[.]" *Id.* at 121. Duncan replied, "Well, I'm talking to your boss about the job." *Id.* Plaintiff and Duncan continued to go back and forth on this issue, resulting in "loud discussions." *Id.* at 122. Armstrong then "overhear[d] the yelling," said something like, "I don't need to put up with this anymore," and told Plaintiff to leave. *Id.* The situation was becoming heated, so Duncan stepped between Plaintiff and Armstrong, and someone called 911. *Id.* Duncan doesn't recall Armstrong mentioning that Plaintiff "had filed on people[.]" *Id.* Nor does Duncan recall ever learning that Plaintiff filed an EEOC charge against Triton or any other company. *Id.*

B.   *Procedural Background*

Following his termination, Plaintiff filed another EEOC charge against Triton in which he claimed discrimination based on race and retaliation. Doc. 58, Defs.' App., 232. He received his Right-to-Sue Notice on March 19, 2019. *Id.* at 230. Thereafter, he filed a *pro se* complaint (Doc. 3) in this Court against Triton and Armstrong. After retaining counsel and filing an amended complaint, as well as amending his complaint in light of the Court's partial granting of Defendants' motion to dismiss, *see* Doc. 38, Mem. Op. & Order, 1, Plaintiff filed his operative complaint (Doc.

39). In the complaint, he alleges a hostile work environment claim and a retaliation claim against Triton and Armstrong under 42 U.S.C. § 1981. *See* Doc. 39, Second Am. Compl., ¶¶ 20–31. Now, Defendants move for summary judgment on both claims. *See* Doc. 56, Defs.' Mot., 1. Because Defendants' motion is ripe, the Court considers it below.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).

Once the summary-judgment movant has met this burden, the burden shifts to the non-movant to "go beyond the pleadings and designate specific facts" showing that a genuine issue exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). Instead, the non-moving party must "come forward with specific facts showing

that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (citations and quotation marks omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary[-]judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations incorporated) (quotations marks omitted). But the Court need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation and quotation marks omitted). If the non-movant is unable to make the required showing, the Court must grant summary judgment. *Little*, 37 F.3d at 1076.

### III.

### ANALYSIS[4]

Below, the Court first grants summary judgment in favor of Defendants on Plaintiff's hostile work environment claim because, even assuming Plaintiff's allegations are true, they do not demonstrate a hostile work environment. Then, the Court explains that material issues of fact exist as to why Plaintiff was terminated. Accordingly, the Court denies summary judgment on Plaintiff's retaliation claim.

A.     *The Court Grants Summary Judgment in Favor of Defendants on Plaintiff's Hostile Work Environment Claim.*

To prevail on a hostile work environment claim, the plaintiff must show:

---

[4] "Because employment discrimination claims brought under § 1981 are analyzed under the evidentiary framework applicable to claims arising under Title VII," the Court cites to cases analyzing Title VII claims to the extent they are relevant. *See Johnson v. VT Halter Marine, Inc.*, 820 F. App'x 283, 285 n.3 (5th Cir. 2020) (per curiam) (citation and quotation marks omitted).

> (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Collier v. Dall. Cnty. Hosp. Dist.*, 827 F. App'x 373, 376 (5th Cir. 2020) (per curiam) (alterations incorporated) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012)). To satisfy the fourth element, "[t]he harassment must be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Id.* at 377 (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

Defendants assert that even if all factual disputes are resolved in Plaintiff's favor, his allegations "do not show harassment sufficiently severe or pervasive to constitute an abusive working environment[.]" Doc. 57, Defs.' Br., 7. In response, Plaintiff emphasizes that almost every Triton employee "said something offensive to" him; the offensive comments occurred at least weekly; and Triton failed to address Plaintiff's complaints. Doc. 59, Pl.'s Resp., 12.

The Court agrees with Defendants. Because Plaintiff alleges numerous incidents to support his hostile work environment claim, the Court first re-summarizes Plaintiff's relevant allegations below. Then, the Court explains why these allegations are insufficient to sustain Plaintiff's claim.

Plaintiff alleges several instances of offensive remarks by employees at Triton. First, Plaintiff alleges that while in his own office, he overheard Duncan using the terms "n*****" and "boy" in a conversation with Rick David, and then Duncan and David began talking about Plaintiff without "using these terms out loud anymore[.]" Doc. 58, Defs.' App., 140. Duncan denies using the terms altogether. *Id.* at 208–09. In David's account of that conversation with Duncan, he states that they were discussing a job, and Plaintiff then came to the doorway and stated, "I'm standing right here,

you can address me," presumably because Plaintiff had been involved in discussions about this job. Doc. 60, Pl.'s App., 145–146. David states that Plaintiff then began "to get agitated and it felt as though he was trying to instigate anger with" Duncan. *Id.* at 146.

Next, Plaintiff alleges that David once used the term "monkey" to refer to a Black employee. Doc. 59, Pl.'s Resp., 12. David admits he referred to a person as a monkey but denies that he was referring to a person of color. Doc. 60, Pl.'s App., 143. Additionally, Plaintiff admits that until this "monkey" incident, Plaintiff never had an issue with David—David was "very respectful," so the "monkey" comment "surprised" Plaintiff. Doc. 58, Defs.' App., 130. Plaintiff provides a transcript of the conversation that Plaintiff surreptitiously recorded between he and David. *See* Doc. 60, Pl.'s App., 52. In this conversation, Plaintiff confronted David for calling a "Black man . . . a monkey[.]" *Id.* at 56. David responded that he "wasn't referring to anybody in particular" and that he meant a "grease monkey." *Id.* Plaintiff then explained how hearing terms like "monkey" and "brother" offends him. *Id.* As the conversation continued, David apologized, expressed his respect for Plaintiff, and stated that he did not want Plaintiff to feel uncomfortable. *See id.* at 69, 76. In Plaintiff's words, David asked Plaintiff to "help [him] to learn how not to be a racist person." Doc. 58, Defs.' App., 110.

Further, David, when talking to Plaintiff, once referred to his own son as a "wigger" and "ghetto." *Id.* at 105; Doc. 60, Pl.'s App., 58. The "ghetto" comment occurred during the recorded conversation when David was explaining how his son speaks in a different manner than David or Plaintiff: "[I]t's almost ghetto the way he speaks." Doc. 60, Pl.'s App., 58. When Plaintiff stated that the term "ghetto" was "racist," David stated that "it is a very stereotypical thing to say, but it defines how [his son] is." *Id.* at 58–59. David and Plaintiff then proceeded to discuss their differing

viewpoints on the connotation of the term "ghetto." *See id.* at 59–63.

Next, Plaintiff alleges that after confronting David on use of the term "monkey," employees began to refer to the "Brother printer" in the office—a printer with a manufacturer called "Brother"—"with an inflection or emphasis on the word 'Brother' that led [Plaintiff] to conclude they were mocking him." Doc. 59, Pl.'s Resp., 6 (citation omitted); *see* Doc. 60, Pl.'s App., 144. Plaintiff raised this issue in his recorded conversation with David, during which David apologized and stated he did not mean to offend Plaintiff. Doc. 60, Pl.'s App., 56.

Additionally, Plaintiff alleges that various Triton employees referred to him as "boy" or "homeboy[.]" Doc. 59, Pl.'s Resp., 5, 12; *see, e.g.*, Doc. 58, Defs.' App., 97, 115; Doc. 60, Pl.'s App., 48. David provides an example of an incident in which a supervisor stated, "I'll get this to my boy Jake to get it installed." Doc. 60, Pl.'s App., 145. According to David, Plaintiff then "very quickly said that '[t]hat's a racial term and you shouldn't be saying that,'" despite that both Jake and the man to whom the supervisor was speaking were White. *Id.*

In addition to offensive terminology, Plaintiff recounts a handful of offensive interactions with coworkers. For example, Plaintiff states that Criswell, Duncan, and Hunt passed by Plaintiff's office when the office lacked a working light. *Id.* at 48. Plaintiff claims these men stated the office was "really black" and that Hunt stated he could only see Plaintiff's teeth. *Id.* Next, Plaintiff recounts that Hunt "made it a point to discuss skits from the Dave Chapelle show, in particular the skits in which the actors frequently used the word 'n*****.'" *Id.* Plaintiff also recalls two incidents with a secretary: once, she stated Plaintiff's hair made him look as if he was "from the hood" and "[s]cary"; another time, she "confided to [Plaintiff] in a shameful tone that her grandmother had been African American." *Id.* at 48–49. Plaintiff "understood that" in this second encounter, "the secretary was

- 13 -

trying to soften her statements about [Plaintiff's] hair." *Id.* at 49.

Finally, Plaintiff claims that when he complained about racist comments, Armstrong brushed off his complaints and even once stated that Armstrong "had previously dated a black woman but had never told anyone about it." *Id.*

Even taking all of these allegations together as true, the Court holds they do not rise to the level of a hostile work environment.

"Harassment is sufficiently 'severe or pervasive enough' to create a hostile work environment when it is 'objectively hostile or abusive'—meaning 'an environment that a reasonable person would find hostile or abusive'—and is subjectively perceived by the victim as abusive." *Johnson v. PRIDE Indus., Inc.*, —F.4th—, 2021 WL 3440524, at *4 (5th Cir. 2021) (citation omitted). To decide whether a work environment is objectively hostile, the Court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Collier*, 827 F. App'x at 377 (quoting *Hernandez*, 670 F.3d at 651). "No single factor is required." *Johnson*, 2021 WL 3440524, at *4 (alteration incorporated) (citation omitted). But the alleged discriminatory conduct "must be more than rude or offensive comments or teasing." *Collier*, 827 F. App'x at 377 (alterations incorporated) (citation omitted).

In *White v. Government Employees Insurance Company*, 457 F. App'x 374 (5th Cir. 2012) (per curiam), for example, the Fifth Circuit held that the plaintiff's allegations did not "rise to the level of severity or pervasiveness required to support a hostile work environment claim." *Id.* at 381. There, the plaintiff alleged: (1) that a coworker called a Black client "a 'n*****'" in the plaintiff's presence;

(2) that the same coworker referred to an office as "ghetto"; and (3) that another coworker stated that one Black employee "always wanted to be a white female." *Id.* at 380–81. In holding these allegations insufficient, the Fifth Circuit explained that these incidents were not physically threatening or humiliating; the comments were "isolated remarks"; and the "n*****" comment was not directed toward the plaintiff. *Id.* at 381. Additionally, the court noted that the plaintiff did not point to evidence that these comments affected her work performance. *Id.* at 381–82 (citations omitted). The Fifth Circuit thus concluded that "[t]he race-based comments alleged . . . pale in comparison, both in severity and frequency, to the kind of verbal harassment" that sustains a hostile work environment claim. *Id.* at 381 (citation and quotation marks omitted).[5]

In contrast, in *Johnson v. PRIDE Industries*, the Fifth Circuit found the plaintiff created a fact issue regarding whether he endured sufficiently severe or pervasive harassment. 2021 WL 3440524, at *4. The plaintiff, a Black man, presented evidence that a supervisor in the defendant–company used the "the Mexican-Spanish equivalent of 'n*****'" twice in the plaintiff's presence when the plaintiff was the "only black person present[.]" *Id.* at *5. Further, this supervisor "regularly used racial invective, referring to black employees, including [the plaintiff], as . . . 'f***ing n*****s'" and "f***ing blacks." *Id.* Additionally, the supervisor referred to the plaintiff by terms that, though not "intrinsically offensive," were never used to refer to "other, non-black employees" and thus may have

---

[5] *See also Dailey v. Shintech, Inc.*, 629 F. App'x 638, 640, 644 (5th Cir. 2015) (per curiam) (finding an employee's racially offensive comments—calling the plaintiff a 'black little mother f****r'" at least twice and stating that he would "kick [the plaintiff's] black ass" did "not rise to the level of 'severe or pervasive' harassment"); *Frazier v. Sabine River Auth. La.*, 509 F. App'x 370, 371–72, 374–75 (5th Cir. 2013) (per curiam) (holding the plaintiff's allegations were insufficient to support a *prima facie* case of hostile work environment where he alleged that a co-worker used "the word 'n*****' in" the plaintiff's presence; that the plaintiff heard another coworker used "the word 'Negreet'"; and that a coworker "made a noose and gestured as though he was hanging it around another [coworker's] neck" in the plaintiff's presence).

been "belittling." *Id.* at *7. The supervisor also twice hid paperwork the plaintiff had submitted for a promotion and gave the plaintiff "less desirable work assignments." *Id.* Finally, the plaintiff was forced "to take a medical leave of absence . . . and go on a reduced schedule" due to psychological harm resulting from the harassment. *Id.* Under these circumstances, the Fifth Circuit concluded that there was sufficient evidence for a jury to find that the plaintiff suffered "an objectively hostile or abusive work environment." *Id.*[6]

Here, Plaintiff's allegations do not demonstrate an objectively hostile or abusive work environment. First, the most egregious alleged remarks were isolated instances rather than recurring slurs. *See Collier*, 827 F. App'x at 377 (citation omitted) (directing the Court to examine the frequency and severity of the conduct). According to Plaintiff, David *once* used the terms "monkey," "ghetto," and "wigger"; Duncan *once* used the word "n*****"; and three of the employees *once* called Plaintiff's poorly lit office "very black." To be sure, all of these remarks are ignorant and deplorable. But unlike the racial slurs in *Johnson*, where the same supervisor "*regularly* . . . refer[red] to black employees" as "f***ing n*****s" and "f***ing blacks," each racial slur here occurred once. *See Johnson*, 2021 WL 3440524, at *5 (emphasis added).

Nor were the remarks of which Plaintiff complains physically threatening or particularly humiliating. *See Collier*, 827 F. App'x at 377 (citation omitted). None of the most offensive terms,

---

[6] *See also Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (finding a fact issue as to whether the plaintiffs endured a hostile work environment where, for three years, the plaintiffs "were subjected to: comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African-Americans, and conversations in which a [coworker] and supervisor used the word 'n*****'"), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006); *Watkins v. Tex. CES, Inc.*, 2009 WL 3424736, at *1, *8 (N.D. Tex. Oct. 26, 2009) (denying summary judgment on hostile work environment claim where other employees frequently used the word "n*****" to refer to the plaintiff and other Black individuals; the employees told racist jokes in the plaintiff's presence; and the plaintiff "arrived at work to find a hangman's noose hanging from a railing").

each of which was allegedly used once—"n*****," "monkey," "wigger," and "ghetto"—were directed toward Plaintiff. *See White*, 457 F. App'x at 381 (pointing out that the use of the word "n*****" was not directed toward the plaintiff). And even those terms that Plaintiff alleges were repeated often, such as "boy" and "brother," were not used to refer exclusively to Plaintiff—or even to a person of color for that matter. As David explained in his deposition, Plaintiff was once offended when Triton employees referred to a White man as "boy." *See* Doc. 60, Pl.'s App., 145; *cf. Johnson*, 2021 WL 3440524, at *7 (noting that the supervisor used some terms *only* to refer to the plaintiff). And the repeated use of the term "brother" referred to a printer manufactured by a company called "Brother." Doc. 59, Pl.'s Resp., 6 (citation omitted); *see* Doc. 60, Pl.'s App., 144. The Court recognizes that Plaintiff takes issue with the tone employees used when referring to the "Brother" printer. Nevertheless, taken as a whole, Plaintiff's allegations do not portray physical threat or severe humiliation.

Further underscoring the lack of an objectively abusive environment is Plaintiff's cordial relationship with David. Plaintiff claims that David was the individual who used many of the most racially offensive terms ("ghetto," "wigger," and "monkey"). Yet Plaintiff provides a transcript of a civil dialogue between Plaintiff and David during which David apologized, stated he respected Plaintiff, and asked Plaintiff to educate him. Doc. 60, Pl.'s App., 69, 76. David further states, "I don't want to have you being uncomfortable." *Id.* at 76. In that conversation, Plaintiff himself even acknowledged that the comments of which he was complaining were "only out of fun and joking." *Id.* at 65.

Finally, Plaintiff has not pointed to evidence indicating how the alleged harassment interfered with his performance. *See Collier*, 827 F. App'x at 377 (citation omitted); *see, e.g., Hiner v. McHugh*,

- 17 -

546 F. App'x 401, 408 (5th Cir. 2013) (per curiam); *Johnson v. TCB Constr. Co.*, 334 F. App'x 666,

671 (5th Cir. 2009) (per curiam). Instead, the evidence reflects that Plaintiff, leading up to his

termination, performed "good work" and was amenable to learning new techniques. Doc. 60, Pl.'s

App., 142.

Overall, Plaintiff's allegations fall short of those required to demonstrate a hostile work

environment at summary judgment. Accordingly, the Court **GRANTS** summary judgment in favor

of Defendants on Plaintiff's hostile work environment claim.

B.     *The Court Denies Summary Judgment on Plaintiff's Retaliation Claim.*

To establish a *prima facie* case of retaliation, the plaintiff must show: "(i) he engaged in a

protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link

between the protected activity and the adverse employment action." *Hernandez*, 670 F.3d at 657

(citing *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008)). "If the plaintiff

successfully presents a *prima facie* case, the burden shifts to the employer to provide a legitimate,

non-retaliatory reason for the adverse employment action." *Id.* (citation and quotation marks

omitted). "If the employer satisfies this burden," the plaintiff must rebut the nonretaliatory reasons

offered by his employer and establish "that the adverse action would not have occurred but for the

employer's retaliatory motive[.]" *Collier*, 827 F. App'x at 375 (citations and quotation marks

omitted). Put differently, the employee must "establish[] pretext." *Hague v. Univ. of Tex. Health Sci.*

*Ctr. at San Antonio*, 560 F. App'x 328, 336 (5th Cir. 2014) (unpub.). To do so, "the plaintiff must

do more than cast doubt on whether the employer had just cause for its decision . . . ." *Moore v. Eli*

*Lilly & Co.*, 990 F.2d 812, 815 (5th Cir. 1993) (alterations incorporated) (citation and quotation

marks omitted). To withstand summary judgment, the plaintiff "must show a conflict in substantial

evidence on the question of whether the employer would not have taken the action but for the protected activity." *Hague*, 560 F. App'x at 336 (citation and quotation marks omitted). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996) (citation and quotation marks omitted).

As a preliminary matter, Defendants challenge Plaintiff's ability to establish a *prima facie* case of retaliation, but they do not challenge any specific element of Plaintiff's case. *See* Doc. 57, Defs.' Br., 10–11. In any event, the Court concludes Plaintiff has met his *prima facie* burden.

First, the record supports a finding that Plaintiff engaged in protected activities: Plaintiff complained to his supervisor (David) and Armstrong, and Plaintiff filed an EEOC charge about Triton. *See* Doc. 58, Defs.' App., 99–100, 109, 228; *see also, e.g.*, *Amanduron v. Am. Airlines*, 416 F. App'x 421, 424 (5th Cir. 2011) (per curiam) (noting that an "informal complaint" can be protected activity (citations omitted)). Second, Plaintiff suffered an adverse employment action—he was fired. *See* Doc. 57, Defs.' Br., 1; Doc. 59, Pl.'s Resp., 5. Third, Plaintiff demonstrated a causal link between his complaints and termination. Namely, his termination was no more than two months after his complaint to Armstrong and mere weeks after his filing of an EEOC charge. *See* Doc. 58, Defs.' App., 98–99 (describing his complaint to Armstrong); *id.* at 138–39 (explaining he talked to Armstrong in January 2019); *id.* at 228 (showing an EEOC charge dated February 7, 2019); Doc. 60, Pl.'s App., 50 (stating Plaintiff was terminated on February 27, 2019); *see also Dailey*, 629 F. App'x at 643 (stating the Court may consider the employee's past disciplinary record and temporal proximity between the adverse action and protected activity (citation omitted)). Further, David stated that Plaintiff performed "good work" and had never received a disciplinary warning. Doc. 60, Pl.'s App.,

142–43. Finally, Plaintiff and Armstrong agree that when Armstrong fired Plaintiff, he mentioned that Plaintiff had "filed on" others. Doc. 58, Defs.' App., 142, 219. Accordingly, Plaintiff has established a *prima facie* case of retaliation.

Defendants contend, however, that even assuming Plaintiff established a *prima facie* case of retaliation, Defendants had a legitimate reason for terminating Plaintiff: He "disrupt[ed] the workplace when he got into a shouting match with Danny Duncan, engag[ed] in a verbal altercation with [Armstrong], and . . . call[ed] Armstrong a 'punk ass honkey.'" Doc. 57, Defs.' Br., 11 (alteration incorporated and citations omitted).

Given that Defendants identified a nonretaliatory reason for firing Plaintiff, the burden shifts to Plaintiff to "show a conflict in substantial evidence on the question of whether [Defendants] would not have [fired Plaintiff] but for" his complaints. *Hague*, 560 F. App'x at 336 (citation and quotation marks omitted). To meet this burden, Plaintiff provides three reasons that the record casts doubt upon whether Plaintiff's termination was actually based on the heated argument: (1) though the witnesses of the argument differ in their accounts of the argument, "all the witnesses agree that [Armstrong] mentioned being fed up with" Plaintiff; (2) "[n]one of the witnesses characterized [Plaintiff] as the aggressor in any physical confrontation that occurred"; and (3) Plaintiff's supervisor stated he was satisfied with Plaintiff's work performance and had no plan to terminate Plaintiff. Doc. 59, Pl.'s Resp., 14–15.

Upon review of the record, the Court holds that Plaintiff has shown a conflict in substantial evidence regarding whether his complaints of racially offensive comments—as opposed to the heated confrontation on the day of his termination—motivated his termination. The Court has already recounted the relevant testimony regarding Plaintiff's termination. *See supra* Section I.A.2. And

these factual accounts vary with respect to what took place during the argument, as well as what Armstrong said when firing Plaintiff. For example, Plaintiff and Armstrong agree that Armstrong mentioned Plaintiff's filing of complaints, but it is unclear whether this was a reference to complaints about Triton. Further, Plaintiff's, David's, and Duncan's accounts all include a statement by Armstrong expressing that Armstrong was put out with Plaintiff, but the reason behind this statement is also unclear. Lastly, as noted above, Plaintiff's termination on February 27, 2019, was no more than two months after he complained to Armstrong about Duncan's behavior and weeks after he filed an EEOC charge.

Under these circumstances, reasonable fact-finders weighing the competing narratives could conclude Armstrong fired Plaintiff due to his complaints as opposed to his argument with Duncan. *See, e.g.*, *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 368 (5th Cir. 2013) (noting [that] the parties "make competing allegations, and [that] credibility determinations are best left for trial"); *Long*, 88 F.3d at 308–09 (reversing the district court's grant of summary judgment where "reasonable and fair-minded persons could conclude that the reasons proffered by [the defendant] were pretexts"). Accordingly, the Court **DENIES** Defendants' motion for summary judgment on the retaliation claim.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (Doc. 56). Namely, the Court **GRANTS** summary judgment in favor of Defendants on Plaintiff's hostile work environment claim but **DENIES** summary judgment on Plaintiff's retaliation claim.

SO ORDERED

SIGNED: August 30, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE